Case number 22-2038 Thurman King v. City of Rockford. Oral argument not to exceed 15 minutes per side. Geoffrey Garish for the appellant and may proceed. Are you Mr. Garish? Yes. I'm sorry, I misspoke about who the, I think who the appellant's lawyer was. That's fine your honor. May it please the court, Geoffrey Garish on behalf of defendants, appellants, the City of Rockford, Officer Abati and Officer Bradley. I would like to reserve three minutes for rebuttal. This is a qualified immunity case with intertwined issues of municipal liability and also issues of state law governmental immunity. I'd like to focus on the qualified immunity because that's really the main issue in the case I think. I know the court is very familiar with qualified immunity. It's probably a little different than the last two cases the court heard argument on. Very common doctrine. It's very often applied. But I do want to start with the basics on this because I would submit that the district judge made a very basic error in denying summary judgment based on qualified immunity. The purpose of qualified immunity stated as simply as possible is to protect police officers for honest mistakes. It recognizes that police officers are faced with very difficult life and death situations and so there's room for honest mistakes in judgment. And what that means is even if there's a question of fact as to whether there's been a constitutional violation, that doesn't mean that there's no qualified immunity or that there's even a question of fact about it. And this is I think where the district judge got it wrong. The district judge essentially collapsed the issues of whether there's a constitutional violation with whether there's qualified immunity. And the judge did it both with respect to the initial traffic stop and with the subsequent arrest and restraint. In both instances, the court found a question of fact as to whether there was a violation, then said there's no qualified immunity by defining the constitutional right with a very high level of generality. And I know the court is intimately familiar with the many cases that have said you can't do that. And that really should have been a red flag to the court that something's wrong with the analysis. If you start with the stop, and I hope the court has had a chance to watch the video. I've watched it a few times myself. The district judge recognized, I think correctly, certainly at a minimum, that it's inconclusive as to whether Mr. King came to a full stop. But then the district court declared, therefore, there's no qualified immunity because there's a question of fact. A jury could find that he didn't come to a complete stop. But that's wrong. When the judge recognized that it's inconclusive whether there was a complete stop, that means that a reasonable officer could believe that there was not a complete stop and is free to pull the driver over for violating the traffic violation. Isn't it framed more so, not so much as to whether or not he came to a complete stop, but really as to whether or not he had probable cause to believe that there was a traffic violation and that he was, therefore, entitled to effectuate the stop? I think that's fair, but I don't understand the distinction. If he didn't come to a complete stop and he rolled through the stop sign, that is a traffic violation. The Michigan statute requires that he come to a complete stop. But if there's a question of fact as to whether or not the officer had probable cause to make the stop, then doesn't that stop you, kind of in your tracks? No, because... Because no reasonable officer, in other words, could believe that if there's no probable cause that I can stop this car, right? I think I agree with what you just said. No reasonable officer could believe that you can make a stop without probable cause. But there is probable cause if the officer perceives that he didn't come to a complete stop. Certainly in the qualified immunity analysis, Officer Abate believed that he rolled through the stop sign and didn't come to a complete stop. And the trial judge's, district court's own conclusion supports that because the judge recognized that the video is inconclusive. The inconclusiveness of the video allows a reasonable offer to believe that he didn't come to a complete stop. And that's why he was... We have to defer. You're saying if the district court had found he did come to a complete stop based upon looking at the video, then you would be out of luck. But you're saying because the district court said it was inconclusive, that was enough to say that a reasonable officer possibly could have seen this as not a traffic violation, or as a traffic violation. Yeah, that's correct. If the court had found correctly that there's no question of fact that he came to a complete stop, then there's no basis for probable cause and there's probably no basis for qualified immunity. But it's the inconclusiveness of the video is what allows the judgment call by the officer to make the stop. And the same thing applies to the subsequent restraint. I mean, the district, George, found a question of fact, went through the gram factors, which I think is the right way to do it. The first one being the severity of the crime. The judge said it's not a severe crime. I certainly don't disagree with that. The second one is, was the officer in danger? Was there a reason to fear for her safety? And the third one is, did Mr. King resist? And the judge, again, found a question of fact as to whether there was a basis for being concerned about safety, and a question of fact about whether he resisted. But the video proves that there was at least a minimum, there was a basis for the officer to believe that he did fear for his safety, and certainly it supports the conclusion that Mr. King resisted. I mean, the district court said this, which I couldn't agree with more. Quote, one of the most dangerous moments for a police officer is just before a suspect is handcuffed and remains unrestrained. End quote. Just before that most dangerous moment. This is what Officer Abate observed. After he put the flashing lights on, Mr. King didn't pull over. He continued to drive. He pulled into a driveway. He then got out of the car. He then did not comply with directives to put your hands, show me your hands, step behind the car. He didn't comply with anything, and he was being verbally hostile. I mean, he doesn't, Officer Abate doesn't know if he has a weapon at this point. He starts yelling for his fiance. He's not complying with his directives, and he's being verbally hostile. I mean, these are the circumstances that the officer encountered, and they provide for qualified immunity, even if in hindsight it turns out he wasn't armed. It turns out that he, well, it's unquestionable that he was resisting arrest. The Jackson versus Washtenaw case is the one we cite that says verbal hostility coupled with noncompliance is active resistance. And we also cited the Earnest case that is the same concept. When there's noncompliance and combined with verbal hostility, that is a basis for qualified immunity. The other thing that the judge failed to do is to fail to analyze the issues with respect to Officer Bradley independently. The judge just wound them together. Officer Bradley faced a very different set of circumstances. He arrived when Officer Abate was trying to arrest and trying to restrain Mr. King. That's what he was faced with. And certainly under those circumstances, he was entitled to participate and help Officer Abate restrain Mr. King, who was resisting the restraints. I want to get to the Monell issues, as long as I have a little bit of time. The judge's analysis of Monell was essentially that a jury could infer that based on this policy of two traffic stops, averaging two traffic stops per shift, a jury could infer that this was the basis for Officer Abate stopping Mr. King. But that's wrong. There's got to be some evidence that that is the reason why Officer Abate stopped Mr. King, and there's not. There's no evidence whatsoever of that. So a jury could not infer that in the absence of any evidence. There's also no basis whatsoever for a failure to train, which is the other thing that they've argued. There's also no reason to assume that either Officer Abate or Officer Bradley didn't understand that you can't arrest someone without probable cause. There's simply nothing there on the failure to train. And the failure to investigate is based entirely on this one single incident, which the case law is very clear that a single incident of a failure to investigate does not give rise to a claim under Monell. The state governmental immunity issues are very similar. The standard there is gross negligence. There has to be a showing that the officer acted was so reckless as to demonstrate a substantial lack of concern whether injury results. This I would respectfully submit is really the polar opposite of that. He didn't tase Mr. King. He didn't pull his gun out. He didn't use his baton. And he didn't use pepper spray or anything like that. He did the least that was necessary to do to restrain him. And that's, I go back to the Ernest case. Ernest held, and this is a Sixth Circuit case, that when an arrestee is resisting, an officer can tase, can use pepper spray, and can use a baton. And in that case, the officer didn't do any of that. And so the court stressed that distinction, said he didn't do any of this. So he's certainly entitled to qualified immunity. And I would submit the same here. He didn't do any of these things. He tried to get Mr. King to cooperate. He wouldn't do it. He then did what he had to. He tried to forcibly restrain him, take him down. He tried to get his arms behind his back. You can see that he resisted. And so he did what he had to to restrain him. He didn't use any other means than trying to take him down, which is permitted under longstanding case law. There's, the troubling part of this case is that when you realize that the two, Abate and King, had had a, knew each other previously, and if Mr. King did come to a full stop, then all the rest of the course of conduct could possibly be viewed as essentially vindictiveness or, you know, the stop would be pretextual and the rest of it could have been folded simply because of the prior relationship. I mean, it's pretty fact-intensive. But there's no evidence of that. There's no evidence that he at the time... Well, if there's no violation, I mean, even though Officer Abate refrained from doing things that might have been done, what he did, if viewed in the context of that prior relationship and viewed in the context of King having actually stopped, then the whole conduct becomes viewed differently, doesn't it? But there's no evidence that he recognized Mr. King at the time he saw the car roll through the stop sign. The best evidence they have is after Mr. King got out of the car, he recognized his face. But up until then, that doesn't... Is there not something about the car being recognizable? Maybe I'm not remembering that correctly. I don't remember anything in the record of that effect. But there's also no evidence that to support the inference that the cause of the stop was anything other than the fact that he rolled through the stop sign and that his taillight wasn't working. I mean, that evidence is unrebutted, that that's the reason why he stopped. I see that my time is up. I'll try to answer any questions. Otherwise, I'll reserve for rebuttal. Thank you. Good morning, Your Honor. Steven Drew at the table. Adam Sturman on behalf of Mr. King. I think I have to start out by saying there is evidence. Counsel seems to just ignore the evidence that was brought out by Mr. King and the other evidence. Mr. King testified that, and he was one of the few black residents of the city of Rockford, Mr. King testified that as I'm driving, my wife's, my fiance's car with untinted windows, Officer Abate sees me. He knew me before. He then pulls around and follows me. And then when he got out of the car, says, I know you, in that sense. I think we have the... Who says I know you? Officer Abate said I know you at the scene. They seem to be inferring that the lower court committed reversible error, and I agree that the standards for qualified immunity, which you get a lot, are well established. They've been established in Pullian v. City of Owasso, Wright v. City of Euclid, Campbell v. Mack, but I almost feel I have to reiterate them. A dispute about a material fact is genuine evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. It is improper to allow an officer to enjoy qualified immunity when evidence allows a reasonable juror to conclude that that officer violated a constitutional right that was clearly established. The right to be free from traffic stops without probable cause or reasonable suspicion indicates that qualified immunity doesn't apply. This was a stop where, if you look at the video, and by the judge saying... The judge I think indicated that is a jury question. I am not going to say that it's not. If you look at the video, when he stops and the officer's car is going at the same speed, the car isn't moving, and the officer's car for two or three seconds, and we cited I think R69-3, is coming right up on him. That clearly looked like a stop. He then takes his foot off the brake and goes on. The prosecuting, and there is evidence in the record, Chief Robinson, after he was stopped, we say without probable cause, after he's then charged with a felony assault of an officer, and charged with driving under the influence, when the video absolutely clearly shows the car was not weaving, there was nothing to indicate that it was under the influence, the Chief Prosecuting Attorney in Kent County looked at the video and Officer Robinson indicated, what did he say to you? He said, I looked at the video and it looked like he stopped. I'm dismissing the charges in the interest of justice. So those are questions that a jury, under the standards that we've identified, should indicate the case, and should decide with looking at the video. And I think... Suppose we agree with you that there was not probable cause to make the stop. We still have to address, though, Mr. King, it appeared on the video that he was making some movement away from the officer. Why isn't that enough to justify subduing him at that point? Well, number one, because the videotape shows what it shows, but assuming that there was no probable cause or reasonable suspicion for the stop, then everything else... Let's just assume there was. It was not. It was not, yes. So there's a violation, but I guess there's the question of, nonetheless, you have an encounter going on between a suspect and the police, are the police then justified in what they did? And that's why, as the judge indicated, you take all the facts and the circumstances into account. And one of those facts... What's holding me up is the fact that I think there's evidence that King was moving away. So why isn't that enough to justify subduing him at that point? Well, number one, under the Graham versus Connor standard, that's not acting actively... There's a question of fact as to whether that's actively resisting. There's also a question of fact, attempt to evade by flight. He's just calling to his fiancée, Michelle. The officer grabs him. He's not running away. He's not trying to indicate anything like that. He's showing his hands. He's walking back. He's saying, why did you stop me? And part of the facts in this case, in that sense, is that he's stopped in the middle of the night when he knew he didn't do anything wrong. So that was why he put his signal on, went into his driveway of his home a half a block away. It's 22 seconds. He stops at the stop sign. He's driving there, and all of a sudden the lights come on, and he knows. So he's trying to get to a safe harbor. But it is not in that sense... Well, as this court indicated in Wright versus Euclid, the mere failure of a citizen not arrested for any crime, so if he had not committed any crime, to follow the mere failure of a citizen not arrested for any crime, to follow the officer's commands, do not give law enforcement officials authority to put the citizen in handcuffs unless he's feared for his safety. That was in the Wright case in that sense. So there was nothing when he is indicating, what did I do? I didn't commit any crime. An officer says, you ran a stop sign. He knows he didn't. And then if there is no crime, that doesn't give the officer the right to then put the citizen in handcuffs, to grab him, to throw him down face first, injuring his head. And by the way, when they threw him down, his hand... And these are alternate facts, but the facts from Mr. King, his hand is underneath his body. And that's when Officer Abate and Officer Bradley put the knee in his back. He says, I can't breathe. His hand is underneath. He's not... There's a question of fact. He's not resisting. This man did not approach the officer. He did not look at him and come at him in a threatening manner. He didn't do anything of that nature to justify grabbing him and throwing him down. I think I have to speak to the Monell issue. First of all, obviously, qualified immunity doesn't apply to Monell. But this is a unique situation that has something to do with the stop. Do you agree that we have jurisdiction to hear the Monell issue? I have seen some cases where if the qualified immunity issue... The qualified immunity does not apply in that sense to the Monell question. But obviously, there are issues about what happened in that sense. Do you think it's tied up sufficiently with the individual client? I don't actually, but it still goes back to what happened at the scene and whether qualified immunity would apply to the officers. So obviously, if the qualified immunity would apply, which we don't think it does, then how do you deal with the Monell issue in that sense? But I think the Monell issue is very important and has to be dealt with. On this case, the quota that they had, and on page 33 of their brief, they indicate that this is a minimal citizen contact, that this policy applies to... It doesn't have to be a traffic stop. That it could be for a car stop for mechanical problems, for out of gas, or a fender bender. I almost want to say that's disingenuous because the policy said you must stop them twice for every 10 hour shift. Is there anything in the record as to why the city had this policy? They say they don't have it anymore. Why they had it at one time. Were they trying to raise money? You got to wonder. Think about what the policy did. You must, for every 10 hour shift, stop two people. That's what it said. They had it posted in the hallway, like some game or something who's going to get it. But more importantly, as to why this policy was a moving force for this man getting stopped when there was none, in December, they had it posted Christmas month. He had stopped 27 people, not 28. This was not a policy that says you have to average. They've said average. That wasn't in the policy. And when they wrote him up, and I can cite the record if you need it, but they said, you did 27 out of 28 stops. We are going to be monitoring you closely for the next several months. That was in February of 2019. We are going to give you discipline if you don't do, and it didn't say average stops. It didn't say stop somebody and help them fill their gas tank up. It said if you don't make two traffic stops every 10 hour shift, we're going to be monitoring you closely for the next several months or you may be disciplined. It's that next month, and there's other things in the record, but that next month is still within that time when he stops him. That is arguable the moving force of this policy, this Monel policy, this custom and policy that caused this to happen. That caused him to allege that he had not stopped at a speed, in that sense. They never charged him with those things and things of that nature. So we think that that, also they never trained the officers, any of them, on probable cause. We subpoenaed all the records. There was nothing in reference to their training as well in that sense. So we think that clearly there are a number of facts that a jury looking at the inference the closest from the perspective of Mr. King should look at this issue. As far as the state claims and false arrest, I think those are sort of connected to Michigan Constitution and things of that nature. One question I have about that is there's this case called Oldham v. Wayne County from Michigan, and it seems to say that the Ross inquiry is a subjective test, not an objective test. Do you know what I'm talking about? Yeah, the Ross was the government immunity portion of state law, Ross v. Consumer's Power, I believe. The district court seemed to be applying an objective test here, not a subjective test in looking at that question. Yeah, I think that that was, you know, you get into the issues of gross negligence and things of that nature with Ross, but I think that it was, I think we would say whether subjective or objective, this stop was unconstitutional because it was... So you don't think it makes any difference? No, I don't think so. But we really didn't have the district court make that finding. It seems like the district court was just looking at it objectively. But you're saying we as a reviewing court can go ahead and say no harm here because even if the district court had looked at it subjectively, as a subjective test it would have been the same outcome? Yeah, and I think obviously on the federal level the subjective intent of the officer is not directly relevant to qualified immunity in that sense. But I think that under the state law claim, the Constitution, when they put their knees on his back, when he was faced with a gun, when he was talking, you can breathe, that shows the deliberate indifference, which is part of the standard in the state law. That shows malice and things of that nature that there would be a question of fact in that regard, Your Honor. Also, I think under Michigan law, although I really don't think the facts support, if you look at the tape, that he was actively resisting. Just questioning why I've been stopped for what was an illegal stop and calling for his fiance and walking, showing his hands. He never grabbed the officer. The officer grabbed him. He never approached him. Under Michigan law, people versus Marino, and I think we cited in our brief, you have a right to resist an unlawful arrest. But I really don't think that's the key germane. I think he was unlawfully stopped because there was no reasonable suspicion and probable cause to stop him. And he did it so he could make his quota. There's a question of fact in that regard. So in that sense, we think that we would ask that this Court affirm the lower court's ruling. Thank you. Just a few quick points. I want to start with the policy of two traffic stops per shift on average. I think it's important to note that's not exactly a large number. Two stops in a 10-hour shift for an average is essentially just ensuring that the officers are not sitting in a coffee shop all day and not doing their job. It's hardly much to require two citizen contacts. But Officer Abate wasn't meeting them, right? Because he was disciplined for it. Correct. That's right. But the point, and the judge said that that's enough to allow an inference that the reason for this stop was so he would comply with the policy. There's no evidence of that. There's no basis for an inference for that. The mere fact that there's a policy and that he hadn't met it and that he makes a stop... Well, a fact question could arise from the whole course of the officer's conduct and the knowledge of the policy just adds... I mean, you might not be able to determine factually that in fact that's why he stopped, Mr. King, but it would provide a possible motive. I don't know that it's relevant. I don't know that it's relevant when there's no evidence whatsoever that that was the reason. But his conduct is arguably very out of proportion to the real facts of this case. So, you know, you take various other things and you might wonder if you believe that Mr. King did in fact stop and if you wonder why even if he didn't, this incident became a big deal. You might think that perhaps the officer was in part at least motivated by the existence of that policy. But there's got to be some evidence of that. I mean, the fact that there's a policy, I will stipulate, it makes you wonder maybe is there some... Is it possible that that's why he did it? But that's not the way it works. I think it's still relevant. Well, if you credit the testimony that he saw, Mr. King says that a body saw who he was before he stopped him. And he knew that King had had trouble with the law before, so that creates a situation where the officer might think, well, this is somebody I should stop because I've seen him before. I know he might commit crimes. How do you respond to that? When analyzing whether qualified immunity applies to the stop, it doesn't matter what the officer's motive is. If an officer observes someone commit a civil infraction, he is entitled to pull him over. But it is relevant to Monell whether or not there's a tie of the government policy to what he did. But with Monell, there still has to be some evidence that this is why he did it, that the policy caused him to do this. I would suggest that his subsequent conduct provides some real issues about the reasons for the stop and so on and so forth. But if by subsequent context, Your Honor, you're referring to what he did after Mr. King violated his instructions, got out of the car, started to walk away from him and wouldn't comply, again, whatever his motives might be, an officer is entitled to use force to restrain a suspect under those circumstances. The case law is very clear about this, especially when it comes to qualified immunity. I see that my time is up. If the Court has more questions, I'll try. I know it's been a long day. I think we are ready for it. Thank you, Your Honor. This needs to be over. Thank you both for your argument. We'll consider the case carefully.